## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

KATRINA HAMILTON,

       **Plaintiff,**

                                        **Civil Action 2:12-cv-02**
      **v.**                                  **Judge George C. Smith**
                                        **Magistrate Judge Elizabeth P. Deavers**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Katrina Hamilton, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security  ("Commissioner") denying her applications for social security disability insurance benefits, supplemental security income, and child disability benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 14), the Commissioner's Memorandum in Opposition (ECF No. 16), and the administrative record (ECF No. 9).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed her application for benefits on July 27, 2007, alleging that she has been disabled since January 3, 2007, at age 19.  (R. at 160-63, 164-66.)  Plaintiff alleges disability as a result of chronic fatigue syndrome, depression, anxiety, fibromyalgia, and a seizure disorder.  (R. at 197.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.

On August 18, 2009, Administrative Law Judge Michael J. Cummings held a video hearing.  (R. at 59-72.)  On September 11, 2009, Judge Cummings issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 106-15.)  On March 11, 2010, the Appeals Council granted review and remanded the case for further proceedings before Administrative Law Judge Irving A. Pianin ("ALJ") to clearly and fully address the treating specialist records and assessments of Dr. Todd Gates together with the records used in the initial hearing and the new and material evidence submitted subsequent to the hearing.  (R. at 116-20.)

On August 24, 2010, the ALJ held a video hearing at which Plaintiff and a vocational expert appeared and testified.  (R. at 73-96.)  On August 31, 2010, the ALJ issued a decision denying Plaintiff's applications.  (R. at 18-29.)  Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.  (R. at 1-3.)  Plaintiff then timely commenced the instant action.

## II.  HEARING TESTIMONY

### A.  Plaintiff's Testimony

Plaintiff testified that she lives with her disabled mother.  (R. at 77, 374.)  She is able to drive.  (R. at 82.)  She had prior work experience as a cashier and cook.  (R. at 92.)  Plaintiff testified that she is currently attending college at Ohio University and living on campus with a friend.  (R. at 78, 85.)  She is studying theater and has been able to complete approximately thirty credits.  (R. at 78.)  She indicated that her college has provided her with accommodations such as a special chair.  (R. at 80-81.)  She also indicated that the school provides transportation between classes so that she does not have to walk long distances.  (R. at 90.)  Plaintiff represented that she only schedules a few classes each quarter as she is easily overwhelmed, frustrated, and fatigued by a large workload.  (*Id.*)  She further indicated that she attends small classes because large classes give her anxiety.  (*Id.*)  She testified that she gets along with teachers and fellow students, has friends at college, and is now living with one friend.  (R. at 84.)  Plaintiff stated that her roommate takes care of the household chores.  (*Id.*)  Plaintiff indicated that she is able to do her own laundry, but that she does not cook or make her bed.  (R. at 85-86.)  During the day, she tries to read, catch up on school work, and sleep.  (R. at 86.)

Plaintiff testified that she cannot work because of her unrelenting pain.  (R. at 80.)  Plaintiff identified her worst problems as fibromyalgia, depression, and anxiety.  (R. at 81.)  Plaintiff represented that she has significant difficulty sitting and standing for long periods of time and that her daily pain affects her ability to concentrate and maintain focus on tasks and assignments.  (R. at 80.)

Plaintiff indicated that she takes several medications, including Zoloft and Colothin for her mood and anxiety issues; Keppra for her history of siezures; and Flexiril, a muscle relaxant. (R. at 81-82, 88.)  She does not take any prescription or over-the-counter pain medications.  (R. at 88-89.)  She added that it had been a year and a half prior to the hearing since she last had a seizure.  (R. at 82.)  Plaintiff also admitted to smoking marijuana two to three times each week. (R. at 87.)  She testified that she has discussed this with her doctors and that "they all agreed that they would rather [she] smoke Marijuana than [take] Narcotics."  (*Id*.)  Upon examination by her attorney, Plaintiff explained that her doctors did not want her to build up a tolerance or get addicted to pain medications.  (R. at 90.)

Plaintiff estimated that she could lift "a couple of pounds."  (R. at 88.)  According to her testimony, it hurts her back, shoulders and neck to lift more.  (*Id*.)  She tries to use a cart so that she does not have so many books to class.  (*Id*.)  She testified that she cannot sit for more than five minutes. (*Id*.)  She can "comfortably [walk for] only a few minutes."  (R. at 89.)

Plaintiff indicated that her "biggest problem" attributable to her anxiety is "not wanting to be around people."  (R. at 90-91.)  She added that her "depression makes it really hard to concentrate, especially in class."  (R. at 91.)

**B.    Vocational Expert Testimony**

The ALJ asked the vocational expert Barbara Byers ("VE") a series of hypothetical questions.  He first asked the VE to assume an individual with Plaintiff's vocational profile who was limited to light work, provided that the work allowed the individual an opportunity to alternate positions sitting and standing on a periodic basis; would not require more than occasional postural activities; and, as a seizure precaution, would not expose the individual to

hazards with the additional mental restrictions of only simple and routine one- or two-step tasks as the result of moderate limitations in concentration and persistence and no more than occasional contact with coworkers, supervisors, and or the general public as the result of moderate limitations in the ability to maintain social function.  (R. at 92-93.)  Based upon this hypothetical, the VE acknowledged that the hypothetical individual could not perform Plaintiff's past relevant work, but that other light, unskilled jobs would be available at the state and national levels.  (R. at 93.)  Representative employment at the light, unskilled level included mail clerk with 1,000 positions locally and 200,000 positions nationally; an agricultural produce sorter with 1,000 positions locally and 250,000 positions nationally; and representative employment at the sedentary, unskilled level included an automatic grinding machine operator with 1,700 positions locally and 135,000 positions nationally.  (R. at 93.)

The VE confirmed that if Plaintiff misses more than one or two days per month from work it would make it difficult, if not impossible, to performs any unskilled work.  (R. at 94.)  The VE further testified that if Dr. Gates' assessments in the essential psychological areas were credited, the hypothetical individual could not sustain even unskilled work.  (*Id*.)  The VE represented that she believed her testimony to be consistent with the Dictionary of Occupational Titles ("DOT") with the exception of the sit/stand option, which she explained it was her experience that the employment she identified would permit the individuals to periodically change positions sitting and standing.  (*Id*.)

### III.  MEDICAL RECORDS

The record contains treatment notes from primary care physician, H. Choong Kim, M.D. dated from November 2004 through August 2007.  (R. at 329-71.)  Dr. Kim treated Plaintiff for

back and neck pain, headaches, depression, fatigue, and insomnia.  (*Id.*)  On January 31, 2007, Plaintiff complained of constant headaches, back pain, neck pain, crying all day, and feeling weak and lethargic.  (R. at 339.)  Dr. Kim ordered an MRI of Plaintiff's brain, which revealed no abnormalities.  (R. at 353.)

On July 6, 2005, Plaintiff met with Registered Nurse Tina Phelps because "within the last month" she had experienced increased depression, anxiety, insomnia, excessive worry, racing thoughts, and decreased appetite.  (R. at 438.)  She reported that she had previously been doing well without medication or treatment, but was feeling overwhelmed with her numerous activities and job.  (*Id.*)  She met with psychiatrist Todd Gates, D.O. for medication management on July 12, 2005.  (R. at 437.)  He described her mental status exam as "unremarkable" and noted that she was "very active in school activities," "perform[ing] well academically," and "working too much."  (*Id.*)  Plaintiff reported periodic spells of insomnia.  (*Id.*)  Dr. Gates diagnosed Plaintiff with acute adjustment reaction with anxious mood and prescribed Atarax for sleep assistance.  (*Id.*)  In October 2006, Dr. Gates noted that Plaintiff's sleep medication had provided relief on an "as needed basis" and that she presented as "entirely normal" on a mental status exam.  (R. at 433.)

On December 26, 2006, Plaintiff complained of increased mood swings, feeling hopeless, and low energy.  (R. at 432.)  Dr. Gates noted she "further progressed into her depression."  He diagnosed Plaintiff with major depression recurrent and prescribed Wellbutrin and Effexor.  (*Id.*)  He recommended that she take a day off of work.  (R. at 432.)  On January 27, 2007, Dr. Gates noted that Plaintiff's "current medicines seem to be satisfactory" and that her "[m]ajor depression had stabilized."  (R. at 431.)

6

On February 20, 2007, Plaintiff presented to Dr. Gates with diffuse muscle aches and pains, low energy, decreasing weight, and muscle twitches.  (R. at 429.)  Dr. Gates expressed his concern that Plaintiff was experiencing side effects from the Wellbutrin and advised her to discontinue taking it.  He recommended further evaluation of her cortisol level, which had been obtained by her family physician.  (*Id*.)  Dr. Gates diagnosed her with major depression and generalized anxiety disorder.  On March 15, 2007, Dr. Gates noted that Plaintiff's energy levels had increased and that she "appear[ed] to be less depressed, more optimistic about the future." (R. at 428.)  Plaintiff reported that she had applied to three colleges.  (*Id*.)  He continued his diagnoses of major depression.  (*Id*.)

On April 10, 2007, Dr. Gates noted that Plaintiff remained plagued by physical symptoms consistent with chronic fatigue deficiency syndrome.  Plaintiff reported muscle and joint aches, a lack of energy, and insomnia.  (R. at 427.)  He noted that Plaintiff was "benefitting from her depression medication," "optimistic about the future," and "happy with her new boyfriend."  His noted impressions included "[m]ajor depression improved" and "[c]hronic fatigue syndrome with fibromyalgia.  (*Id*.)

On May 8, 2007, Plaintiff presented to consulting neurologist Gary Mellick, D.O., with complaints of headaches.  (R. at 322-23.)  Plaintiff reported that her headaches start with a dull ache and proceed to a throbbing ache that causes pain to go down her spine.  She stated that sleeping helps ease the pain.  She described her pain as constant and rated it at three or four out of ten without medication.  She reported that the headaches made her unable to cope with anything and that her immune system felt down.  Plaintiff underwent multiple lab tests, all with normal results.  On her mental status exam, Dr. Mellick observed Plaintiff to be alert, oriented,

pleasant, and cooperative.  He found no abnormalities in her speech or memory.  On physical

examination, Plaintiff demonstrated normal muscle strength, decreased reflexes, and marked

tenderness in the cervical area, with tenderness to palpation in trigger points on the right side of

her neck, trapezius, and thoracic spine.  She was also tender to palpation in her lumbar spine.

(*Id*.)  Dr. Mellick diagnosed Plaintiff with post-viral chronic fatigue syndrome and fibromyalgia;

migraine headache with cervical component; muscle tension headaches; and chronic daily

headaches.  He prescribed Topomax and Gabapentin and ordered an EEG and EMG/NCS.

Plaintiff shared the results of her neurology exam with Dr. Gates on May 9, 2007.  Plaintiff

reported that she had benefitted from her depression medication, and Dr. Gates noted that her

major depression had improved.  (R. at 426.)

      Dr. Mellick interpreted Plaintiff's May 17, 2007 electroencephalogram as abnormal due

to epileptiform discharges in the left hemisphere, suggesting regions of potential seizure activity,

but he did not observe any seizures.  (R. at 321.)  Plaintiff's May 30, 2007 nerve conduction

study of her upper extremities was normal.  (R. at 327-28.)  Dr. Mellick reported that Plaintiff's

June, 11, 2007 electroencephalogram was abnormal due to suggested regions of potential seizure

activity, but he did not observe any seizures.  (R. at 319.)  Plaintiff's July 9, 2007 x-rays of her

right shoulder showed no evidence of arthritis, bone destruction, or calcific tendinitis.  (R. at

326.)  Dr. Mellick described a July 10, 2007 MRI of Plaintiff's cervical spine as unremarkable.

(R. at 325.)  An August 6, 2007 MRI of Plaintiff's abdomen was described as normal.  (R. at

324.)

      On July 10, 2007, Plaintiff presented to the emergency room on after experiencing an

absence-type seizure.  (R. at 303-11.)  She complained of a headache with pain at seven or eight

8

out of ten.  (R. at 303.)  On August 3, 2007, Plaintiff again presented to the emergency room with complaints of another possible seizure, headache, and fatigue.  (R. at 312-15.)  Plaintiff was instructed to follow up with Dr. Mellick the following day.

On August 21, 2007, Plaintiff reported to Dr. Mellick that everything is pretty much the same, she remains in a lot of pain, but the medication "feels like it is starting to help."  (R. at 316.)  She rated her pain at a four out of ten with Tylenol.  (*Id.*)  Dr. Mellick listed Plaintiff's diagnoses as post viral chronic fatigue syndrome and fibromyalgia; migraine headaches with cervical component; RLS/PLMD (Restless Legs Syndrome/Periodic Limb Movement Disorder)/ hypersomnia; chronic daily headaches; seizure disorder; and major depression.  Dr. Mellick prescribed a number of medications and ordered blood tests and sleep tests.  (R. at 316.)  Consistently, that same day, Plaintiff reported to Dr. Gates that she was "feeling a little bit better."  (R. at 422.)  He recommended terminating Effexor, Plaintiff's anti-depressant medication, because it was most likely to contribute to weight gain.  (*Id.*)

In early September 2007, Dr. Gates noted that Plaintiff was discouraged over her inability to enroll in college at Kent State, but that she discussed pursuing voice lessons and dance lessons.  (R. at 421.)  Plaintiff reported that her relationship with her boyfriend "remains very good."  (*Id.*) Dr. Gates noted that her major depression had improved.  (*Id.*)  Later that month, Dr. Gates prescribed Zoloft and Klonopin as needed for panic attacks.  (R. at 420.)

On October 1, 2007, Richard Halas, M.D. examined Plaintiff on behalf of the state agency.  (R. at 372-76.)  Plaintiff described her appetite as poor, reported problems sleeping, experiencing crying spells, and having feelings of hopelessness and worthlessness.  (R. at 373.)  She lived with her mother who did most of the household chores.  She reported that she does not

drive because of seizures and that she has few friends.  Dr. Halas described her affect as "flat and shallow."  (*Id*.)  He found her to be more dependent than independent and noted that she demonstrated slow and hesitant speech, psychomotor retardation, and was tearful at times.  (*Id*.)  Dr. Halas diagnosed Plaintiff with depressive disorder and generalized anxiety disorder with occasional panic attacks and some social phobias.  (R. at 374.)  He assigned Plaintiff a Global Assessment of  Functioning ("GAF") score of 45,[1] but indicated her functional severity was above this level, at 60.  (R. at 375.)  Dr. Halas opined that Plaintiff has moderate limitations in her ability to relate to others and withstand stress and pressures of work.  (*Id*.)  He found no limitations in Plaintiff's ability to follow through with simple instructions/directions or in her ability to maintain attention to do simple, repetitive tasks.  (*Id*.)

In November 2007, after review of Plaintiff's medical record, Kristen Haskins, Psy.D., a state-agency psychologist, assessed her mental condition.  (R. at 377–94.)  Dr. Haskins opined that Plaintiff had moderate restrictions in her activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence or pace.  (R. at 391.)  She also found that Plaintiff had experienced no episodes of decompensation.  (*Id*.)  Dr. Haskins concluded that the evidence did not establish the presence of the "Part C" criteria.  (R. at 392.)

On November 6, 2007, Dr. Gates noted that Plaintiff had no further seizures.  He also noted that Plaintiff does live with chronic pain that seems to be psychosomatic, as she has severe

---

[1]The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 33–34 (American Psychiatric Association, 4th ed. text rev. 2000).  A GAF score of 41 to 50 is indicative of having "serious symptoms  or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job) . . . ." *Id.*

stress in her life.  He noted that Plaintiff "has imposed a great deal of expectation on herself."

(R. at 419.)  Dr. Gates further noted that Plaintiff seems to be improved.  Plaintiff reported her

plans of going to Cleveland State, participating in a local play, and getting back into voice and

dance lessons.  (R. at 419.)

On November 10, 2007, state-agency physician Esberdado Villanueva, M.D. reviewed

the record and assessed Plaintiff's physical functioning capacity.  (R. at 395-404.)  Dr.

Villanueva opined that Plaintiff could lift and carry fifty pounds occasionally and twenty-five

pounds frequently; stand and/or walk about six hours in a workday; sit for about six hours in a

workday; push and pull were unlimited; and she could only frequently climb ramps/stairs, stoop,

kneel, crouch or crawl, but never climb ladders, ropes or scaffolds.  (R. at 396-97.)  Dr.

Villanueva further found that Plaintiff should avoid all exposure to hazards such as machinery

and height.  (R. at 399.)  Dr. Villanueva offered the following explanation in support of the

limitations he opined:

> Claimant has a history of fibromyalgia.  She has neck and back pain but no
> focal neurological deficits.  Right shoulder xray was normal.  Limits are due to pain.
>
> This [claimant] has chronic pain with chronic headaches but her muscle
> testing in all her extremities are normal, have multiple lab testing but they are
> normal.  She is given the diagnosis of Fibromyalgia because of her pains.  She also
> has Depression which may factor in [her] claim[s] of pain but that is under her
> psychological evaluation.

(R. at 396.)  Referencing this explanation, Dr. Villanueva noted that Plaintiff's RFC "is revised

to medium."  (R. at 403.)  Dr. Villanueva found Plaintiff's allegations to be credible.  (R. at 400.)

In June 2008, state-agency physician Nick Albert, M.D. affirmed Dr. Villanueva's assessment.

(R. at 440.)

11

On December 5, 2007, Plaintiff reported to Dr. Gates that she was excited about the possibility of moving to Washington with her boyfriend.  She had hoped that she would eventually move to California, as she was interested in pursuing musical arts.  She indicated that she had successfully tapered off all of her medications.  (R. at 418.)  He diagnosed "adjustment reaction with mixed emotional features" and "chronic fatigue syndrome."  (*Id.*)

On February 5, 2008, Plaintiff presented to Dr. Gates with numerous physical concerns. Dr. Gates indicated that he was considering the possibility that Plaintiff has Epstein-Barr viral syndrome.  (R. at 417.)  He noted that Zoloft was providing inadequate relief from depression and anxiety symptoms and that she was benefitting from Valium.  (*Id.*)

On February 15, 2008, upon referral from Dr. Mellick, Plaintiff saw rheumatologists David Regule, M.D. and Ali Askari, M.D.  (R. at 447-49.)  Plaintiff that reported her pain could be severe with laying around for prolonged periods, noting it tends to get worse if she stays up all day.  Plaintiff reported that anti-inflammatory medication initially helped, but that the relief was only temporary.  On examination, Plaintiff had loose joints throughout with joint hypermobility, some positive scoliosis, positive tender points throughout her body, and some SI joint tenderness.  Dr. Regule noted, however, that Plaintiff was "[c]urrently able to transfer and move without difficulties."  He listed the following "impressions":  ligamentous laxity and scoliosis, rule out spondylopathy; some dryness of the mouth intermittently; B12 deficiency; dry skin; rule out systemic condition such as Sjogren's or lupus; narcolepsy and sleep disorder with restless leg syndrome; various seizure disorders and cataplexy; chronic fatigue and fibromyalgia with positive tender point survey; daily headaches and migraines; and pitted nails and eczema

over the 3rd MCP (finger). (R. at 448.) Dr. Askari ordered repeat diagnostic lab work, which was performed that same day. (R. at 405-12, 450-56.)

On February 18, 2008, Dr. Gates reported that Plaintiff had been a patient in his office for the prior four years. Dr. Gates noted that Plaintiff suffers from a very severe and disabling fibromyalgia with chronic fatigue syndrome that is complicated by recurrent major depressive disorder and frequent episodes of seizure activity. Dr. Gates stated that while Plaintiff had once been a superior student, she has become too disabled to attend to school work and she cannot maintain any type of employment as the result of severe impairment in her concentration. He indicated that she is on many anticonvulsives for mood stabilization as well as antidepressants and tranquilizers to treat depression, fibromyalgia, and a seizure disorder. (R. at 413.)

On March 11, 2008, Dr. Gates noted that Plaintiff had a positive exposure to the Epstein-Barr virus with secondary chronic fatigue fibromyalgia syndrome secondary. (R. at 416.) Dr. Gates found Plaintiff to have "very peculiar features of chronic pain" and observed "instability of mood with spontaneous tearfulness." (*Id*.) He noted that she was benefitting from Valium and Zoloft. (*Id*.) On March 18, 2008, Plaintiff expressed concern to Dr. Gates that her panic attacks could become life threatening after a seizure-like incident. (R. at 415.) Dr. Gates noted that Plaintiff remained very anxious. He also indicated that Plaintiff exhibited every feature of a chronic fatigue immune deficiency syndrome. (*Id*.)

On May 29, 2008, Dr. Hong performed bone density testing performed on Plaintiff in connection with her diagnosis of hypermobility syndrome. Dr. Hong determined that Plaintiff had normal bone density for her chronological age. (R. at 441-45.) He recommended that Plaintiff increase her calcium and Vitamin D. (R. at 441.)

On July 22, 2008, Dr. Gates noted that Plaintiff's fibromyalgia had continued to progress. Plaintiff reported feeling weak, difficulty sleeping, severe pain, and only minimal relief on from the medications her neurologist and rheumatologist prescribed.  She discontinued her depression medication due feeling irritable and some nausea.  Dr. Gates prescribed Phenergan to help treat her anxiety and to facilitate sleep and Prozac to treat the symptoms obsessive-compulsive disorder she reported.  Dr. Gates listed her diagnoses as fibromyalgia, Epstein-Barr viral syndrome, major depression, and obsessive-compulsive disorder.  (R. at 528.)

On August 30, 2008, Plaintiff presented to the emergency room after suffering a syncopal episode the prior night.  (R. at 469-85.)  She reported that she fell against metal carrying racks. She reported loss of consciousness and back pain.  (R. at 471.)  X-rays taken of her back and hips were normal.  (R. at 476-77, 485.)  She was prescribed Toradol.

Plaintiff treated with rheumatologist William Wilke, M.D. from October 5, 2008 to March 6, 2009.  (R. at 535-49.)  Initially, Plaintiff described pain in her neck, back, hip, and knee, difficulty falling asleep, low energy, and difficulty concentrating.  Examination demonstrated diffuse myofascial tenderness of the upper body, bilateral sides, and lower body. Dr. Wilke diagnosed Plaintiff with myalgia and myositis not otherwise specified.  (R. at 545.) Examination on December 3, 2008, revealed diffuse myofascial tenderness of the upper body, bilateral sides and lower body.  (R. at 540.)  On March 6, 2009, Plaintiff demonstrated diffuse myofascial tenderness of the upper body, bilateral sides and lower body.  Dr. Wilke continued her diagnosis of myalgia and myositis. (R. at 535-39.)

14

On October 14, 2008, Plaintiff met with Tina Phelps, R.N. in Dr. Gates' office.  (R. at 522.)  Plaintiff reported that she felt quite anxious at times and described experiencing panic attacks.  Nurse Phelps noted that her mood was dysphoric and anxious with congruent affect.

On December 2, 2008, Plaintiff reported that she was not taking any medications as a a result of losing her Medicaid Insurance Card.  (R. at 514.)  Alternative medicines and using free samples were discussed.  Plaintiff reported that she was looking forward to starting college in the winter term.  (*Id.*)  Dr. Gates noted that Plaintiff was "handling her fibromyalgia reasonably well."  (*Id.*)  Nurse Phelps described Plaintiff as "receptive and talkative" and as presenting with a "slightly dysphoric, anxious" mood.  (R. at 515.)  Dr. Gates continued his diagnoses of fibromyalgia, Epstein-Barr Viral Syndrome, and obsessive/compulsive disorder and added that her major depression had stabilized.  (*Id.*)

On February 4, 2009, Plaintiff presented to the emergency room.  (R. at 588.)  She reported that for the prior four days, she had been experiencing generalized lightheadedness, malaise fatigue, feeling off balance, and difficulty communicating at times.  (*Id.*)  She reported utilizing marijuana daily.  (*Id.*)  The emergency room physician, Maria DeLaLuz Lozano, M.D., concluded that her reported symptoms were "most consistent with viral process and anxiety."  (*Id.*)  She noted that although Plaintiff complained of pain in her back, "she had no palpable muscle spasm, negative straight leg raising, negative footdrop, and no evidence of acute sensory loss."  (*Id.*)  Dr. Lozano also noted that upon exam, Plaintiff did not demonstrate significant findings.  She explained that Plaintiff "had normal motor function of all extremities and no focal abnormalities" and that her CT scan of her head and all of her chemistry tests were unremarkable.  (*Id.*)

15

On February 19, 2009, Plaintiff reported to Dr. Gates that she had been feeling more depressed since being off of her antidepressant medication and that her chronic fatigue and fibromyalgia symptoms were worse.  (R. at 625.)  Dr. Gates prescribed an antidepressant medication.  (*Id.*)  On March 10, 2009, Plaintiff complained of persistent headaches that did not respond to treatments and increased panic attacks.  (R. at 621.)  On March 25, 2009, Dr. Gates stated that Plaintiff continued to struggle with fibromyalgia and chronic fatigue syndrome.  (R. at 619.)  He also noted that Plaintiff was optimistic about attending college in the upcoming weeks and that her depression was stabilized.  (*Id.*)

On April 16, 2009, Plaintiff presented to the emergency room with complaints of chest pain and anxiety.  (R. at 562.)  All tests were normal.  (*Id.*)

On April 28, 2009, Plaintiff reported to Dr. Gates that she was having chest pains and expressed "[o]ther somatic concerns."  (R. at 612.)  He noted that a cardiologist would be evaluating Plaintiff's chest pains.  Plaintiff told Dr. Gates that she had stopped her medications for over a week.  Dr. Gates noted that Plaintiff was "apparently experiencing Klonopin withdrawal, has been taking extra Klonopin, and was not able to get her Phenergan filled."  (*Id.*)

In May 2009, Shyam Bhakta, M.D., a consulting cardiologist, determined that Plaintiff's chest pains were non-cardiac in nature.  She reported that she had completed two years of college, but was presently on medical leave.  Plaintiff acknowledged smoking marijuana occasionally for pain.  (R. at 553-59.)

On May 12, 2009, Plaintiff first treated with Bruce Piszel, M.D. for pain.  (R. at 647-49.)  Examination demonstrated thoracic tenderness bilaterally, with muscle spasms bilaterally, and decreased extension and rotation.  He diagnosed Plaintiff with lumbar and thoracic spondylosis

16

and prescribed Percocet.  (R. at 649.)  On May 15, 2009, Dr. Piszel administered a medial branch block at the T4-5 level.  (R. at 643-46.)  Because her initial drug screen came back positive for marijuana and, Dr. Piszel warned her that he would only continue to treat her for the next three months at which point he would discharge her from his practice if she again tested positive for marijuana.  (R. at 642.)  On June 4, 2009, Plaintiff reported that she "lost [her] pain [medications] a while ago . . . off of her dresser top."  (R. at 641.)  Dr. Piszel warned her that it was her "[l]ast chance to continue" and that if in the next two months her pain pill count was inaccurate or she tested positive for marijuana, he would discharge her for noncompliance.  (*Id*.)  On July 6, 2009, Plaintiff left a message for Dr. Piszel that should would not treat with him.  Within this message, Plaintiff indicated that she believed her "dog got into" her pain medication.  (R. at 638.)

On June 16, 2009, Dr. Gates opined that Plaintiff had "good" abilities to function in the following areas:  follow work rules, use judgment, maintain attention and concentration for extended periods of two-hour segments, manage funds/schedules, and to leave home on her own.  (R. at 602-03.)  Dr. Gates further opined that Plaintiff had only a "fair" ability to function in the following areas:  respond appropriately to changes in routine settings; maintain regular attendance; be punctual within customary tolerance; deal with the public; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; understand, remember, and carry out complex job instructions; understand, remember, and carry out detailed, but not complex job instructions; maintain appearance; socialize; and behave in an emotionally stable manner and relate predictably in social situations.  (*Id.*)  Finally, Dr. Gates opined that Plaintiff

had "poor" abilities to understand, remember, and carry out simple instructions; to complete a normal workday or work week due to psychologically based symptoms; and to deal with work stresses.  (*Id.*)

On July 1, 2009, Tagreed Khalaf, M.D., a physical medicine and rehabilitation specialist, saw Plaintiff at the Cleveland Clinic for evaluation of her chronic whole body/low back pain. She rated her pain at an eight to ten on a ten-point scale.  Dr. Khalaf noted that his examination was unremarkable except for diffuse tenderness to palpation throughout her spine.  (R. at 703.) He noted, however, that Plaintiff had "no point tenderness."  (*Id.*)  Plaintiff exhibited normal range of spine motion without pain and normal extremity strength as well as other normal findings on physical examination.  (*Id.*)  Dr. Khalaf advised Plaintiff to followup with Dr. Piszel. (R. at 704.)

On July 7, 2009, Plaintiff was very frustrated because she had not been able to get relief from her chronic fatigue and fibromyalgia syndrome, that she couldn't sleep because the pain, and that she tried numerous sleeping medicines as well as major tranquilizers.  (R. at 667.)  Dr. Gates stated that she had been through numerous evaluations with rheumatology, pain management, internal medicine, and cardiology but no clear cut answers for her pain.  He noted supported therapy would continue through his office, and he also referred Plaintiff to counseling so that she could work on her extraordinary family stressors.  (*Id.*)

A cervical/thoracic spine MRI taken on August 5, 2009, revealed mild disc bulges at C5/6 and C6/7 levels.  (R. at 633.)  All other findings were unremarkable.

On August 11, 2009, Dr. Gates opined that Plaintiff had "fair" ability in six out of twenty-one work-related mental functions:  follow work rules, use judgment, deal with the

public, interact with supervisors, understand, remember and carry out complex job instructions, and maintain appearance.  (R. at 708-09.)  According to Dr. Gates, Plaintiff has "poor" abilities in the following areas: maintain attention and concentration for extended periods of two-hour segments, respond appropriately to changes in routine settings, maintain regular attendance and be punctual within customary tolerance, relate to co-workers, function independently without special supervision, work in coordination with or proximity to others without being unduly distracted or distracting, deal with work stresses, complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, understand, remember and carry out detailed, but not complex job instructions, understand, remember and carry out simple job instructions, socialize, behave in an emotionally stable manner, relate predictably in social situations, management of funds/schedules and in her ability to leave home on own.  (*Id.*)

In September 2009, approximately one month after Dr. Gates rendered his revised opinion, Plaintiff cancelled her therapy appointments and her appointment with Dr. Gates.  (R. at 681-83.)  Plaintiff left a message with Dr. Gates' office explaining that she had returned to college and that "things are good right now" and that she would see him again on her break from school.  (R. at 681.)

Plaintiff next reported to Dr. Gates on December 29, 2009.  (R. at 679.)  She represented that she was "very discouraged" that she had "been forced to stay away from school for the upcoming quarter" because she could not "find a cosigner and cannot finance by way of loans." (*Id.*)  She also shared her "ongoing frustrations in her relationship with her mother and her boyfriend."  (*Id.*)  Dr. Gates indicated that beyond these frustrations, Plaintiff had reported "her

19

medicines are working reasonably well." He further noted that Plaintiff had been off of her medicines and experienced a decompensation and that he planned to re-prescribe her medicines and get her back to functioning once again. (*Id*.)

On January 12, 2010, Plaintiff reported to Dr. Gates that she was grieving the breakup with her boyfriend of several years. (R. at 676.) She also reported that she was unable to return to college because she was still experiencing financial difficulties. (*Id*.) Plaintiff reported feeling overwhelmed. Dr. Gates noted that "while [Plaintiff's] current medicines were offering benefit, her difficulties remained severe." (*Id*.) He diagnosed her with major depression recurrent. (*Id*.) Dr. Gates met with her again on January 13, 2010. (R. at 674.) Plaintiff reported passing out and hurting herself due to low blood sugar, prompting her to go to the emergency room for evaluation of her spine and head. She also reported receiving an eviction notice from her school and that she planned to "hurry to Ohio University . . . to remove her possession[s]." (*Id*.) Dr. Gates noted that Plaintiff "seems to be handling extraordinary stressors in a reasonable fashion." (*Id*.) On January 20, 2010, Plaintiff continued to report stressors and also "aches and pains and bruises." (R. at 672.) Dr. Gates noted that Plaintiff "has had the most benefit from her current regimen as no changes will be made." (*Id*.)

On March 23, 2010, Plaintiff presented to Dr. Gates "with good news that she will be able to return back to college as a benefactor has provided her with a loan." (R. at 670.) She continued to report stressors, including her breakup with her boyfriend and her worries concerning her mother. (*Id*.) Dr. Gates reported that "[o]verall, [Plaintiff] seems to be

20

functioning at a higher level with optimism towards the future and should be able to start back to school in the next few weeks."  (*Id*.)

## V.  THE ADMINISTRATIVE DECISION

On August 31, 2010, the ALJ issued his decision.  (R. at 18-29.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since January 3, 2007.  (R. at 21.)  The ALJ found that Plaintiff had the severe impairments of epilepsy; Epstein-Barr Syndrome; fibromyalgia; chronic fatigue syndrome; migraine headaches; mood disorder; and anxiety disorder.  (*Id*.)  He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ set forth Plaintiff's RFC as follows:

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

21

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work provide[d] it requires only occasional postural activity, the option to sit and stand as necessary; and only occasional contact with coworkers, supervisors, or the general public due to moderate limitations in social functioning. The claimant can perform activity that does not require working at heights or around dangerous equipment due to her history of seizure disorder. Lastly, she can do only simple, routine, repetitive, 1 or 2 step tasks due to moderate limitations in concentration, persistence, and pace.

(R. at 22.)  In reaching this determination, the ALJ gave "moderate" weight to the opinions of Drs. Villanueva and Albert. (R. at 27.)  The ALJ also afforded  "significant" weight to the psychological opinion of consultative examiner, Dr. Halas, finding his assessment consistent with the evidence of record and suggested that the conservative treatment was sufficient to control Plaintiff's symptoms.  (*Id.*)  The ALJ additionally found that Plaintiff's allegations of pain and severe restrictions and limitations are not well-supported by the totality of evidence, including clinical findings and physical examinations.  (*Id.*)  The ALJ assigned Dr. Gates' two assessments "little weight," stating that Plaintiff's school records and self-reports indicated that she performed well in social interaction situations; that Dr. Gates' treatment records indicated improvement around the time of the second evaluation; and that it appeared that Dr. Gates' most negative assessments were based on Plaintiff's subjective complains.  (R. at 26).

Relying on the VE's testimony, the ALJ determined that Plaintiff can perform jobs existing in significant numbers in the state and national economy.  (R. at 28-29.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act.  (R. at 29.)

## VI.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

22

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.    ANALYSIS

In her Statement of Errors, Plaintiff asserts that the ALJ failed to properly evaluate and give weight to the opinion of her treating psychiatrist, Dr. Gates.  Plaintiff also contends that the ALJ failed to properly evaluate her pain.  The Undersigned addresses these arguments in turn.

### A.    Consideration of Plaintiff's Treating Physician

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(d).  The applicable regulations define medical opinions as "statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(d)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(d)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *7 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 312 F. A'ppx 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s),"

25

opinions on issues reserved to the Commissioner are generally not entitled to special

significance.  20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, Plaintiff maintains that the ALJ failed to provide adequate reasons for his dismissal

of Dr. Gates' June 2009 and August 2009 assessments.  Plaintiff also challenges the ALJ's

failure to address Dr. Gates finding of disability, which he expressed in February 2008

correspondence.  She concludes that the ALJ's "failure to provide any substantive basis for

dismissing Dr. Gates' well-supported opinions leaves his decision unsupported by substantial

evidence."  (Pl.'s Statement of Errors 17, ECF No. 14.)

The Undersigned finds no error in the ALJ's consideration and weighing of Dr. Gates'

assessments.  The ALJ acknowledged that Dr. Gates is a treating physician. (R. at 24, 26.)  He

further acknowledged Dr. Gates' "long-time relationship with [Plaintiff]" and summarized his

treatment of her.  (R. at 23-27.)  For example, the ALJ noted that Dr. Gates' treatment records

revealed that Plaintiff's symptoms varied depending on the circumstances of her life such as her

relationship status with her boyfriend and mother and the results of her applications to colleges.

(R. at 24-26.)  He also noted that Plaintiff sometimes stopped taking her medications because she

felt better without them and that she relied on marijuana to self-medicate.  (R. at 24-25.)  He

further acknowledged Dr. Gates' frequent reports that Plaintiff's medication was effective in

relieving her depression.  (*Id*.)  The ALJ specifically considered Dr. Gates' June 2009 and

August 2009 opinions, but accorded them "little weight."  (R. at 26.)  He likewise considered Dr.

Gates' finding of disability, but rejected it, explaining that "his assessment that [Plaintiff] is

disabled is an issue reserved to the Commissioner."  (*Id*.)

26

The ALJ then offered reasons for his assessment of Dr. Gates' opinions.  Specifically, the ALJ pointed out "the lack of objective evidence to support [Plaintiff's] allegations" and then asserted that "[a]s a whole, Dr. Gates' assessments appear to be based on [Plaintiff's] subjective reports and complaints, which are found to be only partially credible."  (R. at 26.)  The ALJ further reasoned that Dr. Gates' opinions are inconsistent with the record and his own treatment notes.  (*Id*.)  By way of example, the ALJ s stated that the social limitations that Dr. Gates' opined are inconsistent with Plaintiff's "school records and self-reports, [which] indicate[] that she performed well in social interaction situations."  (*Id*.)  The ALJ also found the revisions in Dr. Gates' August 2009 opinion to conflict with his treatment notes:  "In August 2009, Dr. Gates revised his statement, reducing the claimant's abilities in all categories, despite the improvement he noted in the treatment records and reports during this period."  (*Id*.)  The ALJ assigned Dr. Halas' assessment "greater weight," explaining that his opinion "is more consistent with the totality of evidence and is based on his expertise and experience.  (*Id*.)

Plaintiff asserts that the foregoing reasons "are not sufficiently specific."  (Pl.'s Statement of Errors 17, ECF No. 14.)  Plaintiff explains that the ALJ's failure to reference specific page/exhibit numbers "does not allow for an adequate review of the ALJ's reasoning."  (*Id*.)  She adds that "it is unclear what evidence the ALJ relied upon in finding [her] condition had improved."  (*Id*.)  The Undersigned disagrees.

The Undersigned concludes that ALJ's proffered reasons satisfy *Wilson's* procedural requirements and are supported by substantial evidence.  *See* 378 F.3d at 544.  The ALJ's findings that Dr. Gates' opinions were inconsistent with the record evidence and in conflict with his own treatment notes likewise constitute legally sufficient reasons to discount his opinion.

*See* 20 C.F.R. § 404.1527(d)(3) (identifying "consistency" with the record as a whole and "supportability" as relevant considerations).  The ALJ's failure to include page/exhibit numbers did not render his proffered reasons inadequate.  Further, he clearly states that Dr. Gates' own treatment records and reports reflect that Plaintiff improved between his June 2009 and August 2009 assessments even though Dr. Gates, in his revised August 2009 assessment, opined that her condition had significantly worsened.  In June 2009, Dr. Gates found either good or fair abilities in eighteen out of twenty-one work-related mental functions.[3]  (R. at 602-03.)  The form defines "fair" as "moderately limited but not precluded . . . [m]ay need special consideration." Consistent with the ALJ's assertion, in Dr. Gates' revised August 2009 opinion, he found that Plaintiff had fair ability in six out of twenty-one work-related mental functions and poor abilities in the remaining fifteen.  (R. at 708-09.)  Dr. Gates failed to provide an explanation for either his June or August 2009 opinions.  His treatment notes, which primarily consist of narrative recitations or Plaintiff's reported symptoms, likewise fail to offer any support for his revised assessment.  *See Beverly v. Astrue*, No. 1:11-cv-41, 2012 WL 395081, at *7 (S.D. Ohio Feb. 7, 2012) (finding that the ALJ reasonably discounted psychiatrist's opinion where his "treatment notes generally relate[d] to changes in [the claimant's] personal and family life . . . and fail to include evidence or clinical findings.  For example, in July 2009, Plaintiff reported primarily somatic complaints and that she was "stressed out financially," but "receiving some benefit" from her medications.  (R. at 667.)  Nurse Phelps described Plaintiff as "future and goal

---

[3]In her Statement of Errors, Plaintiff incorrectly posits that Dr. Gates, in his June 2009 assessment, found that she "lacked the ability to sustain concentration necessary for basic work demands."  (Pl.'s Statement of Errors 12, ECF No. 14.)  Rather, Dr. Gates opined that Plaintiff had "good" ability to "[m]aintain attention and concentration for extended periods of 2 hour segments."  (R. at 602.)

oriented." (R. at 666, 663.) On August 11, 2009, the day Dr. Gates rendered his opinion, Plaintiff reported having conflicts with her boyfriend and expressed her desire to return to college as soon as possible. Dr. Gates' notes reflect that Plaintiff's other complaints were somatic in nature.[4] (R. at 661.) Dr. Gates' treatment notes also fail to support his internally inconsistent opinion that Plaintiff is better able to "understand, remember, and carry out *complex* job instructions" than to "understand, remember, and carry out *simple* job instructions." (R. at 603 (emphasis added).) Finally, the ALJ correctly did not accord Dr. Gates' disability finding "any special significance" given that such a finding is reserved for the Commissioner. 20 C.F.R. § 404.1527(e); *Bass*, 499 F.3d at 511.

In sum, the Undersigned rejects Plaintiff's contention that the ALJ failed to provide any substantive basis for dismissing Dr. Gates' opinions. Notably, the ALJ recognized that Plaintiff had work-related mental limitations, including moderate limitations in her ability to maintain concentration, persistence, or pace and in her social functioning. Plaintiff identified her worst problems as fibromyalgia, depression, and anxiety. (R. at 81.) Consistently, the ALJ accommodated these limitations within his RFC determination, restricting Plaintiff to only

---

[4]Further, Dr. Gates' treatment records dated after he rendered his revised August 2009 opinion likewise do not support his conclusion that Plaintiff's condition was worsening. (*See e.g.*, R. at 681-83 (Plaintiff cancelled therapy appointments and reported that she had returned to college and that "things are good right now"); R. at 657 (Dr. Gates noted that Plaintiff expressed her desire to have her own place and attend college and agreed that this "would be most beneficial"); R. at 659 (Nurse Kozlowski described Plaintiff's affect as "pleasant, willing, appropriate" and noted that Plaintiff "enjoys making schedules and maintaining a filled routine of things to keep busy"); R. at 679 (Dr. Gates noted "her medicines are working reasonably well"); R. at 674 (Dr. Gates noted that Plaintiff "seems to be handling extraordinary stressors in a reasonable fashion"); R. at 670 (Gates reported that "[o]verall, [Plaintiff] seems to be functioning at a higher level with optimism towards the future and should be able to start back to school in the next few weeks").)

occasional contact with others and only simple, routine, repetitive one-or-two-step tasks.  (R. at

22.)  These accommodations are consistent with the record evidence relating to Plaintiff's

medical treatment and activities of daily living and are supported by the medical opinions of Drs.

Halas, Haskins, and Castro.  Further, these accommodations address the "biggest problems"

Plaintiff attributes to her anxiety and depression.  (*See* R. at 90-91 (testifying that her "biggest

problem" attributable to her anxiety is "not wanting to be around people" and that her

"depression makes it really hard to concentrate, especially in class.").)

**B.      Evaluation of Plaintiff's Pain**

According to Plaintiff, "[t]he ALJ erred in his analysis of Plaintiff's disabling pain

conditions."  (Pl.'s Statement of Errors 17, ECF No. 14.)  Plaintiff maintains that the record

contains substantial evidence supporting her allegations of pain.  She further asserts that the ALJ

erroneously failed to address this evidence as required under Social Security Ruling ("SSR") 88-

13.  (*Id*.)  It appears that Plaintiff also suggests that the ALJ failed to properly evaluate her pain

in light of her Fibromyalgia diagnosis.  (*See id*. at 20–21.)

The Sixth Circuit has provided the following guidance in considering an ALJ's

credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability
> claim, a two-part analysis is used in evaluating complaints of disabling pain. 20
> C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v.
> Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the
> there is an underlying medically determinable physical impairment that could
> reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a).
> Second, if the ALJ finds that such an impairment exists, then he must evaluate the
> intensity, persistence, and limiting effects of the symptoms on the individual's ability
> to do basic work activities. *Id.*

*Rogers*, 486 F.3d at 247.

30

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v.  Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).  This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs*., 823 F.2d 918, 920 (6th Cir. 1987)).  Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531.  Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted).  An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531.  In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities; the effectiveness of

medication; and treatment other than medication.  20 C.F.R. § 404.1529(c)(3); SSR 96–7p, 1996

WL 374186 (July 2, 1996)[5]; *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at

*9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such

factors, he or she is not required to discuss every factor within the written decision) (Report and

Recommendation later adopted).

 On a related note, cases involving fibromyalgia "place[] a premium . . . on the

assessment of the claimant's credibility."  *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986,

990 (N.D. Ohio 2003).  This is because "unlike medical conditions that can be confirmed by

objective testing, fibromyalgia patients present no objectively alarming signs."  *Rogers*, 486

F.3d at 243.  "Nonetheless, a *diagnosis* of fibromyalgia does not automatically entitle [a

claimant] to disability benefits . . . ."  *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th

Cir. 2008) (emphasis in original) (citing *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir.1996)

("Some people may have a severe case of fibromyalgia as to be totally disabled from working . .

. but most do not and the question is whether [claimant] is one of the minority.") (citations

omitted)).  Accordingly, in cases involving fibromyalgia, an ALJ must assess Plaintiff's

credibility and "decide . . . if the claimant's pain is so severe as to impose limitations rendering

her disabled."  *Swain*, 297 F. Supp. 2d at 990.

In this case, the Undersigned finds that the ALJ reasonably assessed Plaintiff's

Complaints of pain.  Contrary to Plaintiff's assertion, the ALJ *did* consider her fibromyalgia

diagnosis in evaluating her complaints of pain.  Indeed, the ALJ found that Plaintiff had multiple

---

[5]Plaintiff cites to the requirements set forth in SSR 88-13.  SSR 95-5p, however, superceded SSR 88-13.  In addition, SSR 96-7p superceded 95-5p in July 1996.

severe impairments, including fibromyalgia and chronic fatigue syndrome.  (R. at 21.)  The ALJ considered Plaintiff's testimony that she had difficulty sitting or standing for prolonged periods and experienced persistent pain throughout her body due to fibromyalgia.  (R. at 23.)  He concluded that although Plaintiff's impairments could reasonably cause the alleged symptoms, she was not entirely credible as to her statements concerning the intensity, persistence, and limiting effects of her symptoms.  He further concluded that Plaintiff's allegations of pain and severe restrictions and limitations are not well-supported by the totality of the evidence.  The ALJ determined that his RFC accounted for Plaintiff's symptoms and credited evidence indicating that she required a sit/stand at will opinion; could only do light work; and could only make postural changes occasionally.  (R. at 23.)  In formulating this RFC, he assigned "moderate weight" to Drs. Villanueava and Albert's assessments.  (R. at 27.)  Notably, the ALJ's RFC contains more restrictive limitations than those opined by Drs. Villanueva and Albert.  (*See* R. at 395-404, 440.)  The ALJ agreed that more recent evidence, including the hearing testimony, supported his findings of additional limitations.  (R. at 27.)

    In support of his findings, the ALJ noted that consultations with specialists resulted in little evidence of significant impairment.  He considered records from treating rheumatologist Dr. Wilke, who consistently noted only tenderness with palpation, with no pain upon movement of Plaintiff's joints.  (R. at 535-49.)  He also considered Dr. Gates' treatment notes, which only described Plaintiff's complaints and contained no objective clinical findings.  The ALJ further considered Dr. Askari's notes, which revealed that he recommended physical therapy and functional capacity testing.  He additionally referenced Dr. Khalaf's records.  In July 2009, Dr. Khalaf, like Dr. Wilke, found only tenderness with palpation.  Finally, he considered the

treatment notes of pain management specialist Dr. Piszel, who effectively discharged Plaintiff for failing to comply with his treatment plan when she continued to test positive for marijuana.

The ALJ also considered Plaintiff's ability to perform self-care activities and significant activities of daily living.  (R. at 22, 27.)  He noted that Plaintiff complained of diffuse pain, yet, at the same time, expressed excitement about starting college.  (R. at 24.)  He also noted that Plaintiff's medical records reflected only conservative treatment and at times, she would cease taking all of her medications because she insisted that she felt better both mentally and physically without medication.  (R. at 27.)

In sum, the Undersigned finds the above articulation sufficiently specific in conveying the ALJ's reasoning.  The Undersigned further concludes that the evidence the ALJ relied upon constitutes substantial evidence supporting his credibility determination.  Although Plaintiff points to other relevant factors that may support a different credibility finding, an ALJ's decision in this area is entitled to deference.  Here, it was reasonable for the ALJ to conclude that Plaintiff was not entirely credible to the extent her testimony contradicted his RFC determination.  The Undersigned, therefore, finds no error in the ALJ's assessment of Plaintiff's credibility concerning her complaints of pain.

## VIII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


Date:  February 22, 2013                                  /s/ *Elizabeth A. Preston Deavers*
                                                         Elizabeth A. Preston Deavers
                                                         United States Magistrate Judge